# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| OLYMPIA EXPRESS, INC., an Illinois corporation; and NEOTOURS, LTD., an Illinois corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 02 C 2858 |
| vs. | ) ) | Magistrate Judge Sidney I. Schenkier |
| LINEE AEREE ITALIANE S.P.A., D/B/A ALITALIA AIRLINES, a foreign corporation, | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 4, 2006, a jury awarded plaintiffs $8.5 million in damages in this breach of contract case. On October 19, 2006, the parties timely filed various post-trial motions. Defendant, Linee Aeree Italianne S.P.A. d/b/a Alitalia Airlines ("Alitalia"), has filed three motions: (1) a motion to vacate the judgment as void, or in the alternative, for judgment as a matter of law (doc. # 171); (2) a motion for judgment as a matter of law with respect to the $5.5 million in damages that the jury awarded for lost sales of airline tickets, or in the alternative, for a new trial on that damage claim (doc. # 168); and (3) a motion to alter judgment with respect to the $3 million in damages the jury awarded for lost profits on land tour packages, or in the alternative, to order a remittitur of those damages or to grant a new trial (doc. # 165). Plaintiffs, for their part, have filed two post-trial motions: (1) a motion to amend or correct the judgment to include pre- and post-judgment interest (doc. # 160); and (2) a motion for an award of costs (doc. # 163).

Our rulings on these motions are as follows. *First,* we deny Alitalia's motion to vacate the judgment as void or, in the alternative, to grant Alitalia judgment as a matter of law on the breach of contract claim. *Second,* we deny Alitalia's motion attacking the jury award of $5.5 million in lost profits on airline ticket sales. *Third,* we deny Alitalia's motion to alter the judgment with respect to the $3 million award of damages on land tour packages and its alternative request for a new trial on that damages claim; however, we grant Alitalia's other alternative request for a remittitur on the land tour packages portion of plaintiffs' lost profits damages claim. *Fourth,* we deny plaintiffs' motion to amend the judgment to include an award of pre-judgment interest, but grant the motion for an award of post-judgment interest. *Fifth,* we grant plaintiffs' request for costs, awarding plaintiffs $39,065.39. We explain our reasoning for these rulings below.

## I.

Alitalia moves to vacate the judgment as void, on the ground that it was the product of a jury trial that could not properly be conducted against Alitalia due to the jury trial immunity granted to foreign states under 28 U.S.C.§ 1441(d). In the same motion, Alitalia alternatively moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on the ground that plaintiffs' contract claim fails under the statute of frauds. We reject each of these challenges to the jury's verdict.

## A.

We start with Alitalia's challenge to our authority to conduct a jury trial in this case. When the case was removed to this Court in April 2002, Alitalia was majority-owned by the Republic of Italy and thus qualified as a foreign state under 28 U.S.C. §§ 1441(d) and 1603(a). Because of its foreign state status, Alitalia was immune from jury trial pursuant to Section 1441(d) ("upon removal

the action [against a foreign state] shall be tried by the Court without jury'). However, as of December 2005, the Republic of Italy had divested itself of majority ownership of Alitalia. In light of that development, plaintiffs moved for a trial by jury, on the ground that Alitalia no longer was a foreign state and thus no longer could claim immunity from trial by jury. In a Memorandum Opinion and Order dated June 14, 2006, this Court granted plaintiffs' motion for a jury trial. *Olympia Express, Inc. v. Linee Aeree Italiane S.P.A.*, 437 F. Supp.2d 780 (N.D. Ill. 2006). In that opinion, we explained the three-part rationale for our decision.

*First*, we held that Alitalia lost its immunity to jury trial when Alitalia lost its foreign state status. *Olympia Express*, 437 F. Supp.2d at 784-87. We explained that jury trial immunity is granted to corporations that are majority-owned by foreign governments only as a matter of the comity that is extended to foreign sovereigns. As a result, the purpose of granting that immunity ceases once a corporation loses its foreign state status, even if it loses that status only after a suit is commenced in federal court. "Considering post-suit developments in a defendant's foreign state status is essential to furthering the purposes of the FSIA without unnecessarily limiting the right of a United States citizen to jury trials in suits brought in United States courts." *Id.* at 786. We rejected Alitalia's argument that *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), required the Court to ignore post- suit developments in foreign state status when deciding whether a defendant is immune from jury trial. To the contrary, we concluded "the rationale employed by *Dole,* which focuses on the purposes to be served by FSIA immunity, is consistent with the analysis . . . that we use here." *Olympia Express*, 437 F. Supp.2d at 786.

*Second*, the Court held that despite Alitalia's loss of foreign state status, the Court still possessed subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a)(2).

3

*Olympia Express*, 437 F. Supp. 2d at 787-88. This Court read Section 1441(d) – which both creates the jurisdictional basis for removal to federal court by a foreign state defendant, and grants that foreign state defendant jury trial immunity – as a "non-severable package, or an integrated whole." *Id.* at 787. As a result, the Court concluded that because Alitalia no longer was a foreign state, Section 1441(d) no longer provided a basis for federal jurisdiction. However, the Court explained that once Alitalia lost its foreign state status, the Court was authorized to exercise diversity jurisdiction based on Alitalia's status as a citizen of the Republic of Italy. The facts establishing the basis for diversity jurisdiction existed from the outset of the case, but could not be given effect by the Court so long as Alitalia had foreign state status. *Id.* at 788. We further noted that while diversity could not be asserted as a jurisdictional basis so long as FSIA jurisdiction existed, there was no bar to recognizing diversity jurisdiction once Alitalia lost its status as a foreign state, thus eliminating the FSIA as the basis for subject matter jurisdiction. *Id.*

*Third*, the Court held that plaintiffs could amend the complaint to assert diversity as the basis for jurisdiction. *Olympia Express*, 437 F. Supp.2d at 788-790. The Court found that from the time of removal, Alitalia had satisfied the factual prerequisites for diversity jurisdiction under Section 1332(a)(2), even though diversity could not be asserted as the basis for jurisdiction so long as Alitalia also was a foreign state. The Court held that an amendment of the complaint to allege diversity jurisdiction was permissible under 28 U.S.C. § 1653, which provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." We explained that the amendment would not be an improper "after-the-fact attempt to create federal jurisdiction where none originally existed," *Olympia Express*, 437 F. Supp.2d at 790, but rather

4

would "reflect an alternative basis for jurisdiction that had existed from the outset of the case." *Id.* at 789.

Alitalia's challenge to the Court's foregoing analysis is almost entirely a rehash of the arguments it previously made in unsuccessfully opposing plaintiffs' motion for a jury trial. That said, in line with the Seventh Circuit's reminder, *In Re Linee Aeree Italiane (Alitalia)*, 469 F.3d 638, 641 (7th Cir. 2006), we have carefully reexamined the jury trial issue. Upon that reexamination, we stand by our previous analysis that plaintiffs were entitled to a jury trial in this case.[1]

**1.**

We have further considered the impact of *Dole* on the jury trial issue presented in this case, and we continue to believe that the analysis in that case supports our conclusion. In *Dole*, the Supreme Court was presented with the question of whether foreign state status for the purpose of FSIA jurisdiction should be determined based on the defendant's foreign state status at the time of the conduct at issue in the lawsuit or, instead, on its foreign state status at the time the suit is commenced. The Supreme Court answered that specific question by holding that FSIA jurisdiction is determined by the defendant's status when suit is filed. *Dole*, 538 U.S. at 478. Contrary to Alitalia's argument, we do not read *Dole* as holding that FSIA jurisdiction and jury trial immunity under Section 1441(d) are irrevocably established if a defendant is a foreign state at the time of removal, even if it then loses foreign state status after removal and well before trial. *Dole* did not address the question of the significance, *vel non*, of post-suit developments on foreign state status

---

[1] We note that plaintiffs argue that Alitalia's motion to vacate is procedurally barred, because it is an impermissible motion to reconsider under Rule 59(e) and/or an improper collateral attack on the judgment under Rule 60(b)(4). We do not find defendant's motion improper procedurally; rather, for the reasons set forth below, we deny the motion on its merits.

5

under the FSIA or how the answer to that question would affect a defendant's right to immunity from jury trial.

That said, *Dole* is important to this Court's analysis of the jury trial question. Alitalia says that subjecting it to a jury trial "denied [Alitalia] the fundamental jurisdictional rights it is entitled to under the FSIA including, *inter alia*, a non-jury trial with respect to claims which arose out of actions of Alitalia that occurred while it was an agency or instrumentality of a foreign sovereign" (Def.'s Mem. at 7). But, that argument is undermined by the holding in *Dole* that foreign state status as of the time of the defendant's conduct does not matter in determining whether foreign sovereign immunity applies. *Dole* explained that FSIA immunity "is not meant to avoid chilling foreign states or their instrumentalities in the conduct of their business, but to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." *Dole*, 538 U.S. at 479. The Supreme Court reasoned that this purpose would not be served by extending FSIA immunity to a defendant who was a foreign state at the time of the challenged conduct, but no longer held that status when suit commenced.

When applied to the question presented in this case, that same rationale leads to the conclusion that the purpose of jury trial immunity under the FSIA would not be served by extending that privilege to a defendant that was a foreign state when suit commenced but no longer held that status by the time of trial. The FSIA grants plaintiffs a significant right: the right to sue the foreign state. But, that right comes at a significant price: plaintiffs lose the right to a trial by jury that would be constitutionally guaranteed in a suit against a non-foreign state defendant. We see no reason that a plaintiff must forego a jury trial against a defendant that loses its foreign state status after suit commences; the loss of that status means that the defendant no longer is entitled to the consideration

6

of comity that is the underpinning for FSIA jury trial immunity. Conversely, we see no reason that a defendant who becomes a foreign state after suit should be ineligible for jury trial immunity under the FSIA: the interests of comity are no less significant with respect to a defendant that becomes a foreign state one month after suit commences than with respect to a defendant who becomes a foreign state one month before suit commences. Thus, as we explained in our earlier opinion, consideration of post-suit changes in a defendant's foreign state status is essential both to furthering the goal of comity that underlies FSIA immunity, and to ensuring that we do so without unnecessarily depriving plaintiffs of their constitutional right to jury trials. *Olympia Express*, 437 F. Supp.2d at 786.

## 2.

In its post-trial motion, Alitalia cites one case that it did not previously offer in support of its argument that it should not have been subjected to a jury trial: *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004). In that case, the plaintiff partnership (Atlas) had invoked diversity jurisdiction in a suit against Grupo, a citizen of Mexico. In fact, at the time of suit in 1997, diversity of citizenship did not exist because Atlas's partnership included two limited partners who were citizens of Mexico. Thereafter, in 2000, the Mexican-citizen partners withdrew from Atlas, thereby creating complete diversity at that time. After losing at trial, Grupo for the first time challenged the court's subject matter jurisdiction. The trial court held that it lacked subject matter jurisdiction because of the absence of diversity at the commencement of suit. On appeal, the Fifth Circuit reversed, holding that the lack of diversity at the time of suit was not fatal to the trial court's jurisdiction because Grupo had not raised the jurisdictional defect until after the jury verdict and, by that time, the defect had been cured.

In a 5-4 decision, the Supreme Court reversed. In so doing, the Supreme Court applied the "time-of-filing rule" that "measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing – whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal." *Grupo*, 541 U.S. at 571. The Supreme Court recognized that there is an exception to this rule, which applies where a lack of diversity is cured prior to trial by the dismissal of the party destroying diversity. *Id.* at 573. However, the Supreme Court held that this exception did not apply in *Grupo*, because there had not been a dismissal of any parties but rather a change in the citizenship of an existing party (Atlas). *Id.* at 574. The majority explained that "allowing a citizenship change to cure the jurisdictional defect that existed at the time of filing would contravene the principle articulated by Chief Justice Marshall in *Connolly* [*v. Taylor*, 2 Pet. 556 (1829)]," *Grupo*, 541 U.S. at 575, which is that "[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Id.* at (citing *Connolly*, 2 Pet. at 556) (emphasis in original).

*Grupo* does not foreclose the approach we have taken in this case. *First*, by its terms, *Grupo* addressed the question of whether a lack of federal jurisdiction based on diversity at the outset of the case can be cured by post-suit events. By contrast, in this case, there was no lack of federal jurisdiction at the time of removal. Federal jurisdiction indisputably existed based on Alitalia's foreign state status under the FSIA.

*Second*, in *Grupo*, the Supreme Court was not presented with, and did not consider, the relevance of post-suit developments in a party's foreign state status under the unique structure of the FSIA. The time of filing (or, time of removal) rule for determining the existence of diversity

jurisdiction has its origins in the policy considerations of certainty and efficiency; the rule is not a constitutional imperative. *See Grupo*, 541 U.S. at 583 (Ginsburg, J., dissenting). Thus, the Supreme Court has recognized an exception to the time of filing rule: an absence of diversity jurisdiction at the time of removal can be cured, if unnoticed until after judgment, by the dismissal of a dispensable nondiverse party. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 836-38 (1989). Since the time of filing rule is not constitutionally required, we must consider whether the reasons for its black-letter status in the context of diversity jurisdiction transfers well to the context of FSIA jurisdiction.

In our judgment, they do not. In the case of a defendant that loses foreign state status during the pendency of suit, a time of filing rule for determining jury trial immunity would needlessly deprive a United States citizen of the constitutional right to jury trial when considerations of comity no longer required that result. Conversely, a time of filing rule would permit a jury trial against a defendant that becomes a foreign state during the pendency of suit, when considerations of comity should require that the foreign state be accorded jury trial immunity. Neither result augers for the application of a time of filing rule for immutably fixing the foreign defendant's immunity, *vel non*, from trial by jury.

*Third*, unlike *Grupo*, at the time of removal in this case there were facts that created the basis for jurisdiction not only under the FSIA, but also under the diversity statute. As a factual matter, Alitalia was a foreign state (because it was majority owned by the Republic of Italy), thus creating removal jurisdiction under Section 1441(d). At the same time, Alitalia also was a citizen or subject of the Republic of Italy, thereby creating the factual basis for diversity jurisdiction under Section 1332(a)(2) (since plaintiffs both were Illinois citizens). Post-suit events here were not the basis for

9

either creating federal jurisdiction where none originally had existed (as was true in *Grupo*), or divesting the Court of federal jurisdiction that originally had existed. Rather, the post-suit events here were the basis for determining the correct basis for the Court's jurisdiction, so as to ensure that jurisdiction was not exercised in a way that would improperly defeat plaintiffs' right to a jury trial.[2]

*Fourth*, we see no tension between the rule reaffirmed in *Grupo* and the rule reflected in 28 U.S.C. § 1653, which states that amendments to pleadings may remedy inadequate jurisdictional allegations but not "defective jurisdictional facts." *Whitmire v. Victus Limited t/a Master Design Furniture*, 212 F.3d 885, 888 (5th Cir. 2000) (quoting *Newman-Green, Inc. v. Alfonze-Larrain*, 490 U.S. 826, 831, 832 n.5 (1989)). *Grupo* rejected an attempt to allow post-removal events to create diversity jurisdiction that did not exist at the time of removal. Similarly, the purpose of the distinction under Section 1653 between remedying inadequate jurisdictional allegations (which is permissible) and remedying defective jurisdictional facts (which is prohibited) is to protect against a party's "attempt to use § 1653 to retroactively create subject matter jurisdiction." *Whitmire*, 212 F.3d at 888.

In *Whitmire*, the plaintiff had asserted claims under the court's federal question jurisdiction and invoked supplemental jurisdiction for certain state claims. When the trial court granted summary judgment on the federal claims and relinquished jurisdiction over the supplemental state

---

[2]Alitalia asserts that because it was a foreign state at the time of removal, it could not also have been a subject or citizen of a foreign state at that time (Def.'s Mem. at 3). We agree that because it was a foreign state at the time of removal, Alitalia could not be *treated* as a subject or citizen of a foreign state. That is because where FSIA jurisdiction exists it is the exclusive basis for a court to exercise subject matter jurisdiction over the foreign state. The purpose for that exclusivity is to ensure that the benefits accorded to a foreign state under the FSIA (such as jury trial immunity) are not circumvented by a plaintiff asserting a different basis for jurisdiction. *Ruggerio v. Compania Pervana de Vapores Inca Capac Yupanqui*, 639 F.2d 872, 875-78 (2d Cir. 1981). However, the fact that at the time of removal Alitalia could not be *treated* as a subject or citizen of a foreign state for purposes of diversity jurisdiction does not mean that it did not have the *status* of being a subject or citizen of a foreign country. As we earlier explained, once Alitalia lost its FSIA status, there was no impediment to giving effect to the Alitalia's status as a subject or citizen of the Republic of Italy.

10

law claims, plaintiff sought leave to amend the complaint to assert diversity jurisdiction for the state law claims. The trial court denied the amendment, and on appeal, the Fifth Circuit found that denial to be an abuse of discretion. Plaintiff's proposed amendment was proper under Section 1653, because it would not allow plaintiff to "retroactively create" subject matter jurisdiction that did not previously exist; rather, it would merely allow plaintiff to amend the complaint to reflect an alternative basis for jurisdiction that had existed from the outset of the case. *Whitmire*, 212 F.3d at 888-89.

The *Whitmire* reasoning applies here as well. At the time of filing, Alitalia enjoyed a special party status as a foreign state. That status provided Alitalia with a special basis for subject matter jurisdiction (the FSIA), and gave Alitalia a benefit that ordinary subjects or citizens of the Republic of Italy do not enjoy when sued in federal court in the United States: immunity from jury trial. Once Alitalia lost that special status, by virtue of the Republic of Italy no longer owning a majority interest in the airline, Alitalia was left with the underlying status that it always had: that of a citizen of the Republic of Italy. As in *Whitmire*, permitting plaintiffs here to amend the complaint is consistent with Section 1653 and does not offend the rationale of *Grupo*: the amendment allows us to recognize a basis for jurisdiction, diversity, that as a factual matter has existed from the outset of this case.

In sum, for the reasons stated in our earlier opinion and those additional reasons set forth above, the Court concludes that with its loss of foreign state status, Alitalia lost its immunity from jury trial but the Court did not lose jurisdiction over the case. We further conclude that it was appropriate to allow plaintiffs to amend the complaint to reflect diversity as the basis for federal

11

jurisdiction, once Alitalia's FSIA status was lost. Accordingly, we deny Alitalia's motion to vacate the judgment as void.[3]

## B.

Alitalia also argues that, even if conducting a jury trial was proper, the jury's liability verdict was not. Alitalia argues that it is entitled to judgment as a matter of law based on the Illinois Statute of Frauds, 740 ILCS 80/1 (2006). For the reasons that follow, we disagree.

## 1.

At the threshold, we consider plaintiffs' contention that Alitalia has waived the right to seek a judgment as a matter of law on its statute of frauds argument. In order for a defendant to assert a particular basis for judgment as a matter of law in a post-trial motion under Fed. R. Civ. P. 50(b), the defendant must raise that basis during trial by way of a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). Seventh Circuit case law confirms that the defendant must raise that basis for judgment at the close of the plaintiff's case in chief and then must renew the motion at the close of all the evidence and before the case is submitted to the jury. *See, e.g., Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 777 (7th Cir. 2002); *Szmaj v. American Telephone & Telegraph Co.*, 291 F.3d 955, 958 (7th Cir. 2002).

---

[3]Our analysis here, as in our original opinion, treats the question of foreign state status for purposes of FSIA jurisdiction and for purposes of FSIA jury trial immunity to be "a non-severable package, or an integrated whole." *Olympia Express*, 437 F. Supp.2d at 787. We believe that to be the correct reading under Section 1441(d). That said, if one were to consider FSIA jurisdiction and FSIA jury trial immunity to present separable questions, we can envision no objection to considering post trial changes in foreign state status in determining jury trial immunity, but not in revisiting the existence of FSIA subject matter jurisdiction. Under that reading, the existence of FSIA jurisdiction would be determined as of the commencement of suit without considering later changes in foreign state status (as with the time of filing rule in a diversity case). But, post-suit changes in foreign state status would be considered in deciding whether jury trial immunity applies. This would ensure that jury trial immunity would apply where dictated by the considerations of comity, without unnecessarily depriving a plaintiff of its constitutional right to jury trial.

12

Alitalia indisputably moved for judgment as a matter of law, based on the statute of frauds, at the close of plaintiffs' case in chief (10/03/06 Trial Tr. 89:15-91:5). However, plaintiffs argue that Alitalia failed to renew that motion at the close of all the evidence, and thus it has waived the right to raise that argument now (Pls.' Mot. at 4). Alitalia argues that it did renew the motion as required, citing to the following colloquy that took place at the close of all the evidence:

> THE COURT: Now, with that, the lawyers inform me that they have concluded the evidentiary presentation that each side intends to make; [sic] is that correct, plaintiffs?
>
> MR. GRIMM: That is correct, your Honor. We rest before the jury for all purposes remaking all prior motions.
>
> MR. CARULLI: That is correct for the [defendant] and we rest our case also.

(10/04/06 Trial Tr. at 7:13-19).

Alitalia argues that when defense counsel (Mr. Carulli) made the statement quoted above, he was incorporating the statement of plaintiffs' counsel (Mr. Grimm), "remaking all prior motions," including Alitalia's motion with respect to the statute of frauds. The word "correct," says Alitalia, "clearly refers to the statement of counsel for plaintiffs," incorporating his statement about prior motions. "Otherwise," says defendant, "the statement 'and we rest our case,' which was responsive to the Court's inquiry, would be superfluous." The word "also," says defendant, "refers back to the statement of counsel for [p]laintiffs and incorporates the same operative language 'remaking all prior motions'" (Def.'s Reply at 4).

The Court finds that defense counsel adequately – if barely – preserved the right to reassert the statute of frauds in a Rule 50(b) motion. The purpose of requiring a motion for judgment as a matter of law at the close of all the evidence is to give the plaintiff an opportunity to "put in some

13

additional evidence to show that there is a jury issue." *Szmaj*, 291 F.3d at 958. If a defendant fails to renew the motion at the close of all the evidence, the plaintiff may assume that the court's denial of the Rule 50(a) motion at the close of plaintiff's case in chief "was the end of the matter." *Id.* Here, plaintiffs knew that Alitalia had raised the statute of frauds claim at the close of plaintiffs' case in chief, and had disputed the Court's refusal to give a jury instruction tendered by Alitalia on the subject. In all the circumstances, we find that Alitalia renewed the motion when its counsel stated: "[t]hat is correct for defendant . . . also" (10/04/06 Trial Tr. 7: 19). Despite the casual way in which Alitalia renewed the motion, which certainly does not provide a model for lawyers to use in future litigation, we cannot say that plaintiffs fairly could have thought that Alitalia had given up on the point or the statute of limitations matter.

**2.**

We now turn to the merits of Alitalia's statute of frauds argument. Alitalia argues that Illinois law applies. Although plaintiffs acknowledge that in a different post-trial motion they have argued that New York law applies to the question of whether pre-judgment interest may be awarded here, they do not object to application of Illinois law here (Pls.' Resp. at 5 n.2). Plaintiffs argue that the applicable law at this point in the case "is that [contained] in the jury instructions which were supported by the laws of both states" (*Id.*). Put another way, we read plaintiffs as arguing that there is no true conflict between New York and Illinois law on the applicable statute of frauds principles and, as a result, we need not choose between New York and Illinois law. *See In re Aircrash Disaster New Roselawn, Inc. on Oct. 31, 1994*, 948 F. Supp. 747, 750 (N.D. Ill. 1996) ("[a] court need not conduct a choice of law determination unless there is an actual conflict in the substantive law such that the case could have a different outcome depending on which law is applied"). We agree. Thus,

14

for ease of reference, in our discussion below we focus on Illinois authorities, which fail to persuade us that the jury's verdict must be overturned.

The Illinois Statute of Frauds states:

80/1. Writing; necessity; signature

§ 1. No action shall be brought, whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

(West 2006). It is widely held that this statute bars oral agreements, not committed to writing, in order "to prevent the fraudulent enforcement of contracts that were not in fact made." Corbin, CONTRACTS, §§ 317-20, at 393 (1 Vol. Ed. 1952). For the statute of frauds to apply, the agreement at issue must propose performance that cannot be completed "within the space of one year from the making" of the contract. In other words, any promises to perform that require one year or more to satisfy must be put in writing or the statute of frauds bars the agreement.

In this case, it is far too late in the day for Alitalia to suggest that there was no written contact between the parties. The centerpiece of plaintiffs' claim is a written contract: the July 2000 Sales Agreement, which ran for a five-year term from January 1, 2001 through December 31, 2005 (JX 4). In its answer to the first amended complaint, Alitalia admitted "the relationship among the parties is governed by the Sales Agreement, as supplemented, in effect among them and refers the Court to such Sales Agreement for its terms and conditions" (Pls.' Resp.: Am. Compl. & Answer ¶ 10). When seeking partial summary judgment, Alitalia did not challenge the enforceability of the

15

five-year Sales Agreement based on the statute of frauds, although Alitalia did raise the statute of frauds as a bar to any attempt by plaintiffs to use a contract theory to recover damages for the period from 2006 through 2010.

Likewise, jury instructions submitted by the parties further confirmed their agreement that the Sales Agreement was the centerpiece of the relationship between the parties. As the parties jointly proposed, the Court instructed the jury that "[p]laintiffs . . . claim . . . Alitalia . . . breached the parties' contract. When I use the word contract, I mean the legally enforceable agreement between the plaintiffs . . . and Alitalia" (Instr. No. 17). The parties submitted other instructions (also agreed) that reflected their differing views about whether and how that Sales Agreement was modified or supplemented. For example, as the parties jointly proposed, the Court instructed the jury (consistent with plaintiffs' theory) that course of performance, course of dealing and/or trade usage could be used to "explain, supplement or qualify, or add to" the "terms and conditions of the contract" (Instr. Nos. 20-21). And, as the parties proposed, the Court instructed the jury (consistent with Alitalia's theory) on the question of whether the Sales Agreement was amended by a later writing: a letter (with attachments) dated April 23, 2001 (Instr. Nos. 24, 28). Of course, Alitalia has waived any objections to instructions to which it agreed. *See BASF AG v. Great Am. Assur. Co.*, No. 04 C 6969, 2006 WL 2859620, at * 7 (N.D. Ill. Oct. 3, 2006).[4]

At no time did Alitalia argue that the Sales Agreement was completely unenforceable. In its Rule 50(a) motion, Alitalia did argue that under the statute of frauds the Sales Agreement was enforceable only for one year: 2001. Alitalia argued that the Sales Agreement was too indefinite

---

[4] We note that while the parties tendered different versions of the instruction given by the Court as Instruction No. 24, there was no dispute that the jury should be instructed on the question of whether the April 23, 2001 writings supplemented the Sales Agreement.

to be enforced as written, and that if plaintiffs sought to use course of dealing to flesh out the terms of the Sales Agreement, under the statute of frauds they could do so only for one year (10/03/06 Trial Tr. at 88). We rejected that argument at trial, in light of the instructions given and the evidence at trial (*id.*, at 88-89), and we adhere to that ruling now.

**3.**

Alitalia raises two other statute of frauds challenges to the jury verdict: (a) that the Sales Agreement contract is partly oral and partly written and, as a matter of law, must be treated as an oral agreement under the statute of frauds; and (2) the supplemental terms that plaintiffs ascribe to the Sales Agreement by way of course of dealing are really unwritten additions to the Sales Agreement contract that do not satisfy the statute of frauds because they could not be performed within one year. We note that Alitalia did not articulate these arguments either in its Rule 50(a) motion at the close of plaintiffs' case in chief or in Alitalia's cursory renewal of that motion at the close of all the evidence. Thus, these bases for the motion are waived and cannot be the basis for a Rule 50(b) motion. That said, we explain below why in any event each of these arguments fails on the merits.

**a.**

Alitalia argues that the contract is "composed of both oral and written components" and thus "it must be treated as an oral agreement for purposes of analysis under the statute of frauds" (Defs.' Reply at 7). In support of this proposition, defendants cite: *Dresser Industries, Inc. v. Pyrrhus AG,* 936 F.2d 921, 929 (7th Cir. 1991) ("a contract which is partly oral and partly written is considered oral for its legal effect"); *Respect, Inc. v. Committee on the Status of Women,* 781 F. Supp. 1358, 1363 (N.D. Ill. 1992) (when "a contract is thus found to be partly written and partly oral – then the law governing oral contracts still applies"); *Koch v. Illinois Power Co.,* 529 N.E.2d 281, 286 (3rd

17

Dist. 1988) ("a contract which is partly oral and partly written is considered oral for its legal affect"). We find this argument unpersuasive for three reasons.

*First*, while Alitalia now argues that a partly oral and partly written contract must be treated as an oral agreement, in our judgment the jury instruction that Alitalia and plaintiffs jointly proposed said precisely the opposite. By agreement, the Court instructed the jury that "[a] partly oral and partly written contract is as valid and enforceable as a written contract" (Instr. No. 18; 10/04/06 Tr. 21:2-3). That instruction reflects the parties' agreement that a contract partly written and party oral would be treated as a written agreement, rather than an oral agreement subject to the statute of frauds. Alitalia cannot now assert a legal argument that contradicts the law it agreed should – and did – govern the jury's deliberations. *Jabat v. Smith,* 201 F.3d 852, 857 (7th Cir. 2000) (jury instructions given without objection become law of the case).

*Second*, accepting Alitalia's argument would require us to ignore the evidence that the portion of the contract that is not in the text of the Sales Agreement (which Alitalia asks us to conclude is the "oral" part of the agreement) reflects the prior course of dealing between the parties. Plaintiffs and Alitalia had done business pursuant to a series of contracts reaching back to 1984. Plaintiffs offered testimony and other evidence that those prior dealings formed a sequence of conduct between the parties that carried over to the Sales Agreement. That was part of the theory of breach of the Sales Agreement on which the jury was instructed: the jury was told that plaintiffs claimed that Alitalia breached the Sales Agreement by "[u]nilaterally imposing more restrictive terms and conditions upon plaintiffs than provided for in the contract and the parties' course of

dealing" (Instr. No. 24).[5]  Alitalia has failed to establish that a jury could not reasonably conclude, based on the evidence, that the terms that Alitalia says were separate oral agreements were instead supplements to the Sales Agreement based on the parties' course of dealing.

*Third,* we conclude that the authorities on which Alitalia relies are distinguishable.  Unlike our case, *Dresser, Respect,* and *Koch* do not involve situations where the contracting parties entered into a written agreement that was itself enforceable.  *See Dresser,* 936 F.2d at 928-29 (alleged oral renewal agreement barred by statute and not sufficiently evidenced in letters); *Respect,* 781 F. Supp. at 1363 ("It is undisputed that the agreement . . . was oral"); *Koch,* 529 N.E.2d at 286 (plaintiff alleged oral contract for permanent employment and tried to satisfy statute with collective bargaining contract even though he was non-union).  Moreover, unlike our case, Alitalia's authorities do not involve situations where there was evidence of an extensive history of course of dealing between the contracting parties to supplement or add to any writings.  Those cases did not address the role of course of dealing evidence in supplementing or adding to contract terms.  Thus, we find that those cases do not undermine the jury verdict here.

### b.

Alitalia argues that the terms plaintiffs ascribe to the Sales Agreement through course of dealing are in fact a series of separate oral contracts, each of which violates the statute of frauds because each cannot be performed within the span of one year (Def.'s Mem. at 11; Def.'s Reply at 8 (citing *Carl A. Haas Auto Imports, Inc. v. Lola Cars Ltd.,* 933 F. Supp. 1381, 1388 (N.D. Ill. 1996) ("To satisfy the statute of frauds, 'writings must contain the agreement's essential terms' . . . a

---

[5]We note that the parties submitted different versions of this instruction but, on the portion quoted above, the respective versions that they tendered were identical.

requirement that is clearly not met by the ARS Agreements in terms of spelling out the terms of–or even the existence of – a long-term . . . agreement")). In our view, this argument is a variation of same theme offered by Alitalia that we have addressed above: that we must treat all terms of the Sales Agreement that are not within its text as separate oral agreements, and ignore the evidence that they reflect course of dealing of the parties which supplement or add to the contract.

Alitalia again asks the Court to treat the Sales Agreement as though it was the first contract between the parties, and that there were no historical dealings between the parties that would explain, or supplement, or add to its written terms. That premise is flatly contrary to the trial evidence. Alitalia argues that plaintiffs have attempted to use course of dealing evidence to add some 10 additional terms to the Sales Agreement, and thus to create a "mythical contract" (Def.'s Reply at 8). That argument – complete with its rhetorical flourish – was one that Alitalia was free to make to the jury; but, it also was one that the jury, based on the trial evidence, was free to reject. With Alitalia's blessing, the jury was instructed that course of dealing evidence could be used to supplement or add to the terms of the Sales Agreement. In our judgment, the evidence was sufficient to allow the jury to conclude that the Sales Agreement was supplemented by course of dealing.[6]

---

[6]We reject Alitalia's argument that this course of dealing evidence was improper parol evidence. Alitalia has waived this argument, as it agreed to an instruction that described course of dealing evidence as "extrinsic evidence" (Instr. No. 20). Nor do we agree that plaintiffs improperly used "part performance" evidence. As plaintiffs correctly note (Pls.' Resp. at 10), part performance considers whether conduct by the parties occurring after an alleged oral agreement proves the existence of that agreement. *Haas Auto. Imports,* 933 F. Supp at 1388. On the other hand, as the jury was instructed here, course of dealing involves "a sequence of previous conduct between the parties to a particular transaction" (Instr. No. 20). The extensive evidence offered concerning the contractual dealings between the parties prior to the 2001 Sales Agreement was plainly course of dealing evidence.

In short, the evidence and the instructions in this case allowed the jury to reasonably conclude that the terms of the Sales Agreement were supplemented by the parties' long prior course of dealing, and that Alitalia breached the Sales Agreement as so supplemented. Alitalia's statute of frauds argument does not provide a basis to disregard the jury's verdict. We therefore deny Alitalia's motion for judgment as a matter of law.

## II.

We now consider Alitalia's motion attacking the jury's award of $5.5 million on plaintiffs' claim for lost profits on ticket sales. In an earlier ruling in the case, the magistrate judge then presiding required plaintiffs to "segregate and delineate the damages claimed for each plaintiff separately" (doc. # 47). Consistent with that direction, plaintiffs offered separate calculations at trial for the lost profit damages allegedly suffered by Olympia Express and Neotours, respectively, in connection with lost ticket sales. During closing argument, plaintiffs asked the jury to award Olympia Express $5,458,000.00 in lost profits for the period 2001 through 2005, and to award Neotours $1,817,000.00 in lost profits for the same period. The jury awarded each plaintiff substantial damages but in amounts significantly less than that which plaintiff sought: $4,125,000.00 to Olympia Express, and $1,375,000.00 to Neotours. Each of those awards was a little more than 25 percent less than the amount that Olympia Express and Neotours each sought.

Alitalia now seeks judgment as a matter of law on the lost profits damages claim or, in the alternative, a new trial. Alitalia's lead argument in support of these alternative requests is that the lost profits testimony of plaintiffs' expert, James Alerding, failed to meet the standard for

admissibility under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). For the reasons that follow, we reject this argument.[7]

Federal Rule of Evidence 702, which was amended in 2000 to reflect Supreme Court's decision in *Daubert, see United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002), provides that expert testimony is admissible if offered by "a witness qualified as an expert by knowledge, skill, experience, training or education," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. This test for admissibility applies not only to "scientific" knowledge, but also to other forms of specialized knowledge. *Conn*, 297 F.3d at 555 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). Accordingly, as it must be in order to cover the variety of types of expertise covered by Rule 702, the test for admissibility is flexible. *Conn*, 297 F.3d at 555.

As the commentary to Rule 702 makes clear, *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Advisory Committee Notes, 2000 Amendments to Fed. R. Evid. 702 (citation omitted). That point also was emphasized in *Daubert* itself: "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595. "The district court has 'broad discretion' with regard to whether to admit expert testimony, and its

---

[7]As they did with respect to Alitalia's motion based on the statute of frauds, plaintiffs argue that Alitalia has waived its right to seek a judgment as a matter of law because it failed to renew the motion at the close of all of the evidence (Pls.' Opp. at 2-3). For the same reasons set forth above, we conclude that Alitalia sufficiently preserved the argument so that it may be raised on this post-trial motion.

decision 'will be affirmed unless manifestly erroneous.'" *Miksis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997) (citations omitted).

Alitalia argues that Mr. Alerding's testimony fails to meet the standards of Rule 702 on two bases. We address each argument in turn.

## A.

Alitalia argues that Mr. Alerding's calculation of lost profits is fatally flawed because, while he performed separate computations of gross profits for Olympia Express and Neotours, respectively, he failed to determine their costs separately. Rather, Mr. Alerding used the combined total costs calculated for Olympia Express and Neotours, and he then allocated a share of those costs to each entity. Alitalia argues that using costs for one entity to calculate costs for the other entity is an improper methodology, and it thus shows that Mr. Alerding's testimony is not "the product of reliable principles and methods." However, we do not find the arguments offered by Alitalia in support of this contention to be persuasive.

*First*, Alitalia argues that by using a regression analysis that combined costs for Olympia Express and Neotours, plaintiffs' expert violated the March 29 order requiring plaintiffs to segregate and delineate the damages claimed for each plaintiff separately (Def.'s Mem. 5-6). However, we find that plaintiffs complied with that directive: they presented different separate damages calculations for Olympia Express and Neotours, and they asked that the jury award them each separate amounts based on those separate calculations. The March 29 order did not direct plaintiffs as to the manner in which they must segregate and delineate the claimed damages; by suggesting otherwise, Alitalia stretches the meaning of that order farther than it reasonably may go.

23

*Second*, Alitalia argues that Mr. Alerding admitted that it was improper for him to use data from one plaintiff to make projections about the other plaintiff, based on his testimony that one probably could not use "operating costs and gross products of the Chevrolet Division of General Motors, . . . to project anything about the Saturn Division of General Motors" (Def.'s Mem. at 5 (quoting 09/29/06 Trial Tr. 54: 18-22)). However, elsewhere in his testimony, Mr. Alerding explained that it was appropriate to perform a regression analysis using the costs of both companies together and then make an allocation of cost to each company, because Olympia Express and Neotours would "operate as one, and the costs are dependent upon each other" (Pls.' Opp., Ex. 1 (09/29/06 Trial Tr. 71: 13-19). Thus, we do not agree with Alitalia that Mr. Alerding himself has admitted that his methodology was improper.

*Third*, Alitalia fares no better in its argument that Mr. Alerding's testimony should have been excluded under Rule 702 because he offered "no treatises or authoritative textbooks to evidence that the allocation [he] engage[d] is an acceptable methodology" (Def.'s Reply at 5-6). Mr. Alerding testified to his background and experience, and there was no challenge to his qualifications as an expert to testify about a lost profit analysis. And that is precisely what he did: he testified to the manner in which he performed a regression analysis, and he further testified why he believed that he performed that regression analysis in an acceptable manner. As contemplated by *Daubert*, defense counsel conducted a spirited and thorough cross-examination which suggested flaws in Mr. Alerding's regression analysis. However, as the jury was properly instructed, arguments of counsel are not evidence. And, contrary to what *Daubert* contemplates, Alitalia offered no contrary evidence to close the loop and to show that the suggested flaws were, in fact, real flaws. While defense counsel's cross-examination referred to certain publications (including the Federal Judicial Center

24

Manual that is cited in Alitalia's reply memorandum), during trial Alitalia did not offer into evidence any treatises or other publications to demonstrate any error in Mr. Alerding's approach. Nor did defendant call an expert to testify as to any deficiencies in Mr. Alerding's regression analysis.[8] Had Alitalia offered evidence to show the validity of criticisms suggested in the cross-examination of Mr. Alerding, perhaps those criticisms would have carried the day with the jury. Or, perhaps not. There is no way of knowing. However, the absence of evidence of specific treatises citations supporting Mr. Alerding's analysis did not require that analysis to be excluded from evidence.

## B.

Alitalia also complains that Mr. Alerding's "but for" regression analysis of damages was inappropriate because it utilized both historical data predating the breach, and three years of data that post-dated the breach (Def.'s Mem. at 6-7). However, Mr. Alerding testified that it is appropriate to use post-breach data as part of the analysis in determining a relationship between gross profits and costs (Pls.' Opp., Ex. 1 (09/29/06 Tr. 76: 4-77: 11). Mr. Alerding testified that using post-breach evidence was a conservative approach, since the "costs in the breach years are going to be relatively higher as the percentage of gross profit than in non-breach years" (*Id.*, 09/29/06 Tr. 77: 9-11),

---

[8]In a pretrial ruling, the Court barred Alitalia's expert, Frederic Lieber, from testifying about regression analysis because his deposition testimony established he lacked a sufficient basis to do so (02/03/06 Mem. Op. and Order, at 7-10) (doc # 93). While a consulting expert used by Alitalia had performed a regression analysis and had provided the information about it to Mr. Lieber, Mr. Lieber lacked a basis to sponsor that analysis, and Alitalia failed to timely designate the consultant as a testifying expert.

We further note that, even though Mr. Lieber was identified as a "will call" witness, Alitalia made the strategic decision not to present him at trial. Perhaps one reason for that strategic decision was that, in his own expert report in which he calculated damages for Neotours, Mr. Lieber calculated expenses as a percentage of projected gross profit, "based on the weighted average of expense for Olympia and Neotours for the period 1996 through 2000" (Pls.' Opp., Ex. 4 (Lieber Expert Report, Ex. 3 at 2)). Thus, Mr. Lieber calculated Neotours's expenses based on the weighted average of expenses for Olympia and Neotours together -- the type of combined calculation for which Alitalia now criticizes Mr. Alerding. Moreover, Mr. Lieber's cannot plead ignorance of the March 29, 2005 order: his calculation was contained in a report dated June 13, 2005.

25

because plaintiffs' performance and profitability declined dramatically after the breach. In determining lost profits, we fail to see why, in principle, one would ignore consideration of plaintiffs' actual post-breach performance. Again, during trial, Alitalia offered no treatises, no learned publications, and no expert testimony to demonstrate that there was any error in Mr. Alerding's use of post-breach evidence to calculate lost profits. Thus, for the foregoing reasons, we deny Alitalia's motion for judgment as a matter of law on damages.

## C.

We likewise deny Alitalia's alternative request for a new trial on lost profit damages with respect to ticket sales for air travel. In the identical sentence appearing in both in the opening memorandum and in the reply, Alitalia conclusorily argues that a new trial is appropriate because Mr. Alerding's testimony should have been stricken, and that even if that testimony was admissible, it was insufficient to support an award of lost profit damages. As to the first point, having rejected the proposition that Mr. Alerding's testimony should have been stricken in denying the motion for judgment as a matter of law, we likewise reject it as a basis for granting a new trial.

As to the second point, the insufficiency argument, we note that under Rule 59(a), "[o]nly when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day." *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000). In this case, Mr. Alerding's testimony concerning lost profits was vigorously attacked on cross-examination, but uncontradicted by any evidence offered by Alitalia. The jury considered the lost profits evidence, plainly found it credible, and awarded plaintiffs lost profits – although not in the full amount sought. Alitalia's mere statement that the evidence was "insufficient" falls far short of persuading us that the jury's assessment should be overturned.

# III.

In addition to seeking lost profits on sales for air travel, Olympia Express sought a separate award of lost profits based on plans to offer land tour packages for travel in Greece in connection with the 2004 Olympics. Cristos Sotos testified that, "conservatively," he estimated that he would be able to sell 5,000 land tour packages during the 2004 Olympic season, at a gross profit of $500.00 each, for a total gross profit amount of $2,500,000.00 (Def.'s Rule 59(e) Mem., Ex. 1, 09/26/06 Tr. 158: 14-159: 10). Based on that calculation, Olympia Express sought a jury award of $2.5 million in lost profits. The jury awarded that amount, and more – a total of $3 million for lost profits in connection with land tour packages for the 2004 Olympics.

Alitalia's lead argument is that any award of damages on this portion of plaintiff's claims is excessive and that, under Rule 59(e), the Court should "alter or amend" the judgment to reduce that portion of the damage award from $3 million to zero. Plaintiffs object that, while cloaked in the garb of a Rule 59(e) motion, in substance Alitalia's motion seeks a Rule 50(b) judgment as a matter of law that Alitalia cannot ask for directly because during trial Alitalia failed to make the requisite motion for judgment as a matter of law under Rule 50(a) (Pls.' Opp. 1-2). We agree.

A motion for judgment as a matter of law under Rule 50(b) seeks to undo a jury verdict for one party and to enter judgment instead for the other party. That extraordinary relief is appropriate where, based on the evidence presented, there is no legally sufficient basis for the jury verdict. By contrast, Rule 59(a) motions – often colloquially referred to as "motions for reconsideration" – have a different purpose: they are intended to bring to a court's attention manifest errors of law or fact, or newly discovered evidence. *See, e.g., LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995). The commentary specifically states that Rule 59(e) "deals only with alteration

27

or amendment of the original judgment in a case and does not relate to a judgment upon motion as provided in Rule 50(b)." Advisory Committee Notes, 1946 Amendment, Rule 59(a). Consistent with this commentary, one judge in this district has specifically held that "[a] motion under Rule 59(a) cannot be used as an end-run around the requirements of Rule 50." *Deleon v. Atia*, No. 98 C 5919, 1999 WL 1044209, *2 (N.D. Ill. Nov. 9, 1999). In that case, as is true with Alitalia here, the plaintiff had failed to move for a judgment as a matter of law at the close of evidence, and thus was barred from seeking a judgment as a matter of law under Rule 50(b). We believe the same result should apply here.

We have considered Alitalia's arguments to the contrary, and we find them unpersuasive. The authorities that Alitalia cites do not support its proposed use of Rule 59(a).[9] Moreover, Alitalia's suggestion that it could not make a Rule 50(a) motion during trial, because it did not know the jury award of lost profits in connection with 2004 Olympic season would be excessive until it was made (Def.'s Reply at 13), is baseless. Rule 50(a) motions may be made at any time before submission of the case to a jury, when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." In this case, Alitalia had no difficulty moving for a judgment as a matter of law on plaintiff's claim for lost profits for the period 2006 through 2010. There is no reason that Alitalia likewise could not have moved for a judgment as a matter of law on the lost profits claim for land tour packages for the 2004 Olympic season. Indeed, Alitalia did not have to wait for a jury award on this lost profits claim to

---

[9]Two of the cases did not involve a motion under Rule 59(a). *See General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*, 695 F.2d 281 (7th Cir. 1982); *Miksis v. Howard*, 106 F.3d 754 (7th Cir. 1997). In the only other case cited by Alitalia, *Kapelanski v. Johnson*, 390 F.3d 525 (7th Cir. 2004), the Seventh Circuit affirmed the trial judge's denial of a motion to alter or amend the judgment which "did not present any new evidence." 390 F.3d at 532. That affirmance of the trial court's decision to deny a Rule 59(e) motion in no way can be read as sanctioning Alitalia's attempt to use Rule 59(e) to serve the purposes of a Rule 50(b) motion that Alitalia has waived the right to make.

know that Alitalia would view the award as excessive, because Alitalia's argument is that *any* award of lost profits claimed for the 2004 Olympic season would be excessive.

Finally, we reject Alitalia's argument that denying its proposed use of Rule 59(e) would mean that "the challenge of a jury award is excessive can only be made pursuant to Rule 50" (Def.'s Reply at 13). Indeed, the very authorities that Alitalia cites uniformly state that a Rule 59(a) motion for a new trial may be granted where the damages are excessive. *Kapelanski*, 390 F.3d at 530; *Miksis*, 106 F.3d at 757; *General Foam Fabricators*, 695 F.2d at 288.

Having concluded that we cannot give Alitalia the principal relief it seeks (a judgment in its favor on the lost profits claim in connection with land tour packages for the 2004 Olympic season), we turn to the alternative relief that Alitalia seeks: a new trial, or – in the alternative – a remittitur of the $3 million award to $2.5 million. We may grant a new trial if we are persuaded that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *General Foam Fabricators*, 695 F.2d at 288 (quoting case omitted); *see also Kapelanski*, 390 F.3d at 530. "[T]he authority to grant a new trial . . . is confined almost entirely to the exercise of discretion on the part of the trial court." *General Foam Fabricators*, 695 F.2d at 288 (quoting case omitted). That said, we recognize that granting a new trial is not something to be done lightly:

> On the one hand, the trial judge does not sit to approve miscarriages of justice . . . . on the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.

Wright & Miller, Federal Practice and Procedure: Civil 2d § 2806, at 74-75 (1995 Ed.).

29

After carefully considering the arguments raised by the parties, we agree with Alitalia that the lost profits verdict for land tour packages for the 2004 Olympic season cannot stand. There are several reasons for this conclusion.

*First*, the primary evidence that Alitalia would have worked with Olympia Express to facilitate this 2004 Olympic endeavor was a brief exchange of correspondence in 1999 (JX 1, JX 2), more than one year before the parties signed the Sales Agreement that is at the heart of the suit. In a memorandum that he described as listing "issues that need to be addressed," Christos Sotos included as one item for future discussion "a great opportunity for [Olympia Express/Neotours and Alitalia] to launch a viable tour program to Greece from all U.S. gateways," for the 2004 Olympic games in Athens. Mr. Sotos stated that Olympia Express and Neotours "already have in our long-term budget over [$]500,000 earmarked for this project" (JX 1 (A 09248)). Alitalia's one sentence response was to state "we agree with your point and will discuss this matter in further depth in the near future" (JX 2 (A 09242)). There is no evidence that there was further discussion between Alitalia and plaintiffs on this subject between March 1999 and July 2000, when the parties signed the Sales Agreement covering the years January 1, 2000 through December 31, 2005 (JX 4). That contract said nothing about a partnership to "launch a viable tour program to Greece from all U.S. gateways" for the 2004 Olympics. Based on the evidence, it is highly speculative whether, absent a breach, there would have been any arrangement between Alitalia and plaintiffs for tour packages for the 2004 Olympics.[10]

---

[10]Plaintiffs claim that the absence of much in the way of specific cost projections and marketing plans were the result of Alitalia's breach of the contract in the spring of 2001 (Pls.' Rule 59(e) Opp. at 11). However, that does not explain the absence of any cost projections or marketing plans developed in the two-year period between February 1999, when Mr. Sotos floated the idea of tour packages for the 2004 Olympics (JX 1), and the spring of 2001, when Alitalia breached the contract. Nor was there any evidence of what, if anything, Mr. Sotos did with the $500,000.00 that he said had been earmarked for development of the plan.

*Second*, the principal evidence offered by plaintiffs as to their lost profits was Mr. Sotos's testimony that, conservatively, he would be able to sell 5,000 land tour packages at a gross profit of $500.00 each. Problems with this evidence abound. Plaintiffs offered no evidence to support those projections of the sales and profits Olympia Express would have achieved for land tour packages for the 2004 Olympics. Plaintiffs' argument that the performance of Cartan in providing Olympic tour packages is evidence of what Olympia Express could have done is a stretch. Cartan had advantages that Olympia Express would not have had: it was the sole official tour operator for the Olympics; it could use the word "Olympics" and the Olympic symbols in their advertising (which neither plaintiffs nor anyone else could do), and it had an allotment of Olympic event tickets that exceeded what would be available to others, such as Olympia Express.

*Third*, there is serious question as to whether plaintiffs' lost profit calculation improperly utilized gross profits, rather than net profits. Mr. Sotos's testimony specifically referred to his lost profit number of $500 per tour package as gross profit. Plaintiffs argue that despite Mr. Sotos's use of the term gross profit, his calculation in fact reflected net profit. The lead argument plaintiffs offer to support this proposition is that the cost of providing the land tour package already was included in Mr. Alerding's calculation of lost profits for the air travel sales, and thus to reduce the land tour packages profit number by deducting costs would be "double counting" (Pls.' Rule 59(e) Opp. at 13). However, that argument flies in the face of Mr. Alerding's testimony that "we have not calculated any damages related to the tour operation, so obviously the cost that might relate to that that would be outside the cost projected related to the airline tickets would not be included either" (Def.'s Rule 59(e) Reply Ex. 2 (09/29/06 Trial Tr. 114: 14-18)).

31

Plaintiffs also argue that their interrogatory answers disclosed that, as they used it, the term gross profits meant "Revenue Minus Costs of Goods Sold" (Pls.' Rule 59(e) Opp. Ex.: 04/22/03 Supp. Interrogatory No. 5 Response at 2 n.1). Plaintiffs interrogatory answers further stated that "for the 2004 Olympics 5,000 packages valued at $500.00 per package are included in Gross Profits" (*Id.* at 2 n.7). This rather obtuse reference to gross profits in connection with the sale of 2004 Olympic land tour packages falls short of persuading the Court that Mr. Sotos's reference to gross profits in fact meant net profits. As plaintiffs recognize, net profits are derived "by 'subtracting the expenses necessary for plaintiffs' full performance from the contract price' . . . . The cost of performance is made up of direct costs, like labor and materials, and indirect costs, such as overhead." *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 674 N.E.2d 948, 951 (Ill. App. 1996). Plaintiffs' interrogatory response does not state whether "costs of goods sold" encompasses all direct and indirect costs, as required under *Sterling Freight Lines*. What's more, the interrogatory answer states that 5,000 packages at $500.00 per package are included in the gross profits that plaintiffs calculated on lost sales of Alitalia air tickets. The interrogatory does not state whether that $500.00 figure itself was the total price that would have been charged to each customer for the land tour package or is a number that reflects the charge paid by the customer less direct and indirect costs.

In sum, we are persuaded that the evidence offered to support the lost profits claim for sales of land tour packages for the 2004 Olympics is so thin that it would be a miscarriage of justice to allow that portion of the damage award to stand. The question presented, therefore, is whether we grant Alitalia a new trial on this particular damage claim, or instead grant Alitalia's alternative request for a remittitur. In this case, we conclude that ordering a remittitur is appropriate.

"The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of the Christina School Dist.,* 806 F.2d 1198, 1201 (3d Cir. 1986). Our discussion above makes clear that we find that to be the case here. The $3 million award on the land tour lost profits claim was not supported by the evidence, and it is excessive. We order a remittitur of $2 million, to reduce the land tour damages portion of the award to $1 million. In so doing, we recognize that Alitalia has proposed a remittitur of $500,000, to reduce the land tour damages portion of the award from $3 million to $2.5 million (the amount Olympia Express asked the jury to award). However, we are not bound by Alitalia's proposal, and our review of the evidence persuades us that a larger remittitur is in order: in particular, we note (1) the lack of evidence concerning the price at which the tour packages would be sold, so that we can assess what percentage of sales price Olympia Express attributes to gross profits,[11] and (2) the lack of evidence of costs that would reduce claimed gross profits to net profits. Nor do we believe that Alitalia has standing to complain that we grant its request for remittitur, but in an amount that exceeds the reduction that Alitalia suggested.

While we could grant Alitalia's request for a new trial, we conclude that ordering a remittitur is preferable to simply vacating the land tour damages award and ordering a new trial on that lone damages issue. If Olympia Express accepts the remittitur, that will result in the judgment being amended to reflect a reduced damages award, and will avoid the need for a new trial prior to any appeals that the parties may wish to pursue. Of course, if Olympia Express rejects the remittitur, it

---

[11]For example, in its tax returns for 1996-2001 (JX 289), Olympia Express reported gross profits on air ticket sales of 20.9% of gross receipts ($3,993,945 in gross profits out of $19,151,709 in ticket sales). Olympia Express has offered no evidence to show what gross profit margin it would have achieved on the land tour package sales that Olympia Express claims to have lost.

will receive a new trial limited solely to the question of land tour damages, *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391-92 (7th Cir. 1984). Olympia Express shall file a pleading, on or before March 16, 2007, stating whether it accepts the remittitur.[12]

## IV.

Plaintiffs seek to amend or correct the judgment, pursuant to Fed. R. Civ. P. 59(e), to include prejudgment and post-judgment interest. Alitalia offers no objection to plaintiffs' claim for a post-judgment interest, which "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Nor does Alitalia quarrel with plaintiffs' calculation of post-judgment interest at the rate of 4.90 percent, compounded annually (Pls.' Mot. at 15). Thus, we will award plaintiffs' post-judgment interest at the 4.90 percent rate.[13]

Plaintiffs' request for pre-judgment interest is premised not on federal law or on any contractual provision, but rather on application of New York law. Under New York law, "[i]nterest

---

[12]We emphasize that in the event of a new trial, the issue will be limited to Olympia Express's claim for damages for lost sales of land tour packages in connection with the 2004 Olympics. No liability or other damages issues will be reopened, and the case will not be reopened for further discovery.

[13]Because of the remittitur we have ordered, we do not order post-judgment interest on the entire $8.5 million award beginning on October 4, 2006 (when we entered judgment on the entire jury verdict). While 28 U.S.C. § 1961(a) states that "interest shall be calculated from the date of the entry of the judgment," the statute "is silent as to which judgment, if there are amendments, triggers the interest." *Krieser v. Hobbs*, 166 F.3d 736, 747 (5th Cir. 1999). That said, we believe that post-judgment interest should begin accruing on the $5.5 million portion of the judgment that reflects damages for lost air ticket sales as of October 4, 2006, since we have affirmed that portion of the verdict. *See H.J. Inc. V. Flygt Corp.*, 925 F.2d 257, 261-62 (8th Cir. 1991) (post-judgment interest commenced as of the date of entry of judgment on the portion of the damages award that was affirmed on appeal, even though another portion of the original award was remanded for retrial). As to the portion of the judgment that reflects a $3 million award for land tour packages, we cannot yet determine when (or if) post-judgment interest accrues. If Olympia Express accepts the remittitur, then we believe that post-judgement interest will commence on that portion of the award as of October 4, 2006, despite the fact that the original judgment will be amended to reflect the reduced award. *See Litwinowicz v. Qweyerhaeuser Steamship Co.*, 185 F. Supp. 692, 693-94 (E.D. Pa. 1960) (post-judgment interest on a remitted judgment commenced as of the date of entry of the original judgment). If Olympia Express rejects the remittitur, then the $3 million portion of the judgment relating to land tour sales will be vacated and a new trial will be conducted; if the new trial results in an award of damages, then post-judgment interest on that portion of the award will commence as of the date the original judgment is amended to reflect the new damages award.

34

shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ." N.Y. C.P.L.R § 5001(a). This statutory provision is "an affirmative mandate to award prejudgment interest." *Kookmin Bank v. B.G. Fashion, Inc.*, 2000 WL 1880315 (S.D.N.Y 2000). One court described the award of prejudgment interest as "a recognition of the principle that damages are properly ascertained as of the date of the breach and a recognition that there may be a time lag between the accrual of a plaintiff's cause of action and the resulting damage sustained and actual payment by defendant." *Brushton-Moira Cent. School Dist. v. Fred H. Thomas Ass'n*, 692 N.E.2d 551, 554 (N.Y. Ct. App. 1998). Relying on this statute, plaintiffs seek an award of pre-judgment interest in the amount of $4,221,123.00, which reflects interest on the $8.5 million verdict beginning on March 30, 2001 ("the first ascertainable date of breach") at the annual rate of 9 percent (Pls.' Mot. at 14).

Alitalia objects to plaintiffs' request for pre-judgment interest. Alitalia points out that under Illinois law, plaintiffs would not be entitled to pre-judgment interest "absent a statute or agreement providing for it." *City of Springfield v. Allphin*, 413 N.E.2d 394, 396 (Ill. 1980). Moreover, in order for a court to award prejudgment interest under Illinois law, "the damages must be liquidated or subject to exact computation." *Alguire v. Walker*, 506 N.E.2d 1334, 1341 (Ill. App. Ct. 1987). Here, there is no Illinois statute that would authorize an award of pre-judgment interest to plaintiffs; plaintiffs' damages were not "liquidated or subject to exact computation"; and the parties' contract does not provide for payment of pre-judgment interest. Thus, we agree that under Illinois law, plaintiffs are not entitled to prejudgment interest.

Thus (not surprisingly), Alitalia argues that Illinois law should govern the question of pre-judgment interest here for two reasons: (a) plaintiffs have waived any right to assert New York law,

35

by failing to advocate the application of New York law earlier in the case and, to the contrary, by asserting Illinois law; and (b) waiver aside, controlling choice of law principles lead to the application of Illinois law to the question of pre-judgment interest. We address each of these arguments in turn.

**A.**

Alitalia contends that plaintiffs cannot now ask us to apply New York law because it failed to do so earlier and, indeed, cited Illinois law in certain filings. However, neither the parties nor the Court need to engage in a choice of law analysis unless there is a "true conflict" between two potentially applicable laws. *In re Aircrash Disaster Near Roselawn, Indiana on October 31, 1994*, 948 F. Supp. 747, 750 (N.D. Ill. 1996). A true conflict exists when "the substantive law [is] such that the case could have a different outcome depending on which law is applied." *Id.* Thus, in order for Alitalia to prevail on its waiver argument, it must show that plaintiffs earlier advocated the application of Illinois law on a matter where there was a true conflict with New York law.

Alitalia has failed to meet that burden. Alitalia points to four pleadings in which plaintiffs cited Illinois law. However, we find that none of those cases involved matters on which there was a true conflict with New York law.

*First*, Alitalia argues that plaintiffs' emergency motion for a temporary restraining order cited Illinois law on the standards for granting temporary injunctive relief. However, plaintiffs filed that motion while the case was pending in Illinois state court, before the case was removed to federal court. The rules governing the grant or denial of injunctive relief are procedural matters. *Worthy v. Michigan*, 142 F.Supp.2d 806, 809 (E.D. Mich. 2000). And, when a case is pending in state court, the governing rules are supplied by the law of the forum state. *Wilkey v. Golden Feather Realty*

36

*Services, Inc.*, 2006 WL 2478317 at *10 (E.D. Tenn. Aug. 25, 2006). Thus, plaintiffs' appropriate citation to Illinois law on a procedural question while the case was pending in Illinois state court does not bar them from arguing for the application of New York law on a substantive question in federal court now.

*Second*, Alitalia cites to four briefs in which plaintiffs cited Illinois law to support a proposition. However, in each of those instances, there was no true conflict between Illinois and New York law on the proposition in question:

1) In their brief in support of their motion to strike the report and bar the testimony of Alitalia's damages expert, Frederic Lieber, plaintiffs cited Illinois law to support the argument that the expert should only deduct the saved variable costs, and not the saved fixed costs, from a party's calculation of damages. This uncontroversial proposition is accepted in New York as it is in Illinois. *See, e.g., R & I Electronics, Inc. v. Neuman*, 411 N.Y.S.2d 401, 405 (App. Div. 1978) (noting that "the wrongdoer is entitled to a deduction of only such business costs as can reasonably be saved by reason of his breach").

2) In their brief in support of their motion to strike testimony of Alitalia's travel law expert, Alexander Anolik, plaintiffs cited Illinois's adoption of Article I of the Uniform Commercial Code ("UCC") to show the hierarchy to be given to conflicting extrinsic evidence when offered to interpret a contract, and to show that course of performance evidence is accorded more weight than trade usage evidence. However, these principles are the same under Illinois and New York law, as the parties recognized by citing both Illinois and New York law on this point in submitting an agreed jury instruction on these matters (Joint Proposed Instr. No. 20).

3) In their memorandum opposing defendant's motion for partial summary judgment, plaintiffs cited Illinois law to show that the proper measure of damages for a breach of contract is the amount necessary to put the non-breaching party in the same position it would be if the breaching party had performed. However, New York adopts this standard measure of damages as well, *see, e.g., Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs.*, 692 N.E.2d 551, 553 (N.Y. 1998), as the parties recognized by citing both Illinois and New York law in a joint proposed jury instruction (Joint Proposed Inst. No. 29).

Thus, we find nothing in these earlier filings by plaintiffs that would bar them from seeking application of New York law on the question of pre-judgment interest. Plaintiffs had no reason until now to confront the question of whether New York or Illinois law governed a particular question, because – until now – the respective state laws were not in conflict on the relevant state law questions: a point that is underscored by the fact that both sides cited New York and Illinois law interchangeably on the liability and damages jury instructions submitted to the jury. (Instr. Nos. 17-18, 20-23, 25-28, 30-33). For these reasons, we reject Alitalia's waiver argument.

## B.

We now turn to the question of whether New York or Illinois law should control the issue of prejudgment interest. Federal courts presiding over diversity suits apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Illinois applies the most significant contacts test of Restatement (Second) of Conflict of Laws § 188. *Curran v. Kwon*, 153 F.3d 481, 488 (7th Cir. 1998). Under Section 188, courts consider five factors in deciding which jurisdiction has the most significant contacts with the transaction and the parties: (1) the place of contracting, (2) the place of the negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the location of the parties. Restatement (Second) of Conflict of Laws § 188 (1971). In addition, we evaluate those factors in light of "the needs of the interstate and international systems, the relevant policies of the forum, the relevant interests of other jurisdictions with respect to the particular issue . . . , the basic policies underlying the field of law, the need for certainty, predictability, and uniformity of result, and the ease with which the applicable law can be determined and applied." *Curran*, 153 F.3d at 488 (citing Restatement (Second) of Conflict of Laws, § 6).

### 1. Place of Contracting.

In this case, there is no single place of contracting. Alitalia's representative, Rosario Mariani, signed the Sales Agreement in New York (10/03/06 Trial Tr. 31-32). Mr. Mariani then brought the Sales Agreement to Chicago, where Alitalia's Chicago representative, Gabrielle Mariotti, initialed it and plaintiffs' representative, Christos Sotos, signed it (09/26/06 Trial Tr. 70). The Sales Agreement then was sent to Alitalia's headquarters in Italy for final approval (*Id.* at 69).

Normally, the location of the last event necessary to form the contract determines the place of contracting. Restatement (Second) Conflict of Laws, § 188 cmt. e. Here, the last event necessary to form the contract appears to have taken place in a foreign country. The last contracting event in any United States jurisdiction took place in Illinois. Furthermore, two contracting events (Mr. Sotos's signing and Mr. Mariotti's initialing) took place in Illinois, while only one (Mr. Mariani's signing) took place in New York. To the extent that this factor favors the law of any state over the other, it slightly favors application of Illinois law.

### 2. Place of Negotiation.

Much of the negotiation that resulted in the signing of the Sales Agreement took place by telephone between Mr. Sotos in Chicago and Mr. Mariani in New York, and correspondence between Chicago and New York. However, as Mr. Sotos himself admits, he also engaged in personal negotiations with Mr. Mariotti in Chicago: "I spoke with Mr. Mariani but more important and I negotiated more details with Gabriele Mariotti who had a lot of experience" (09/26/06 Trial Tr. at 68). Plaintiffs have not pointed to any evidence of similar face-to-face negotiations in New York. Therefore, this factor favors application of Illinois law.

### 3. Place of Performance.

The Seventh Circuit has commented that the "[m]ore reliable barometers of the site of performance include inquiring what performance formed the basis for the agreement and what action actually occurred in performance of the agreement." *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 573 (7th Cir. 1995). Plaintiffs assert that the performance that formed "the basis" for the Sales Agreement was to occur entirely in New York, because that is where Alitalia was to determine the total available block space, confirm the space, and set net fares. Plaintiffs further assert that the decision to breach the contract took place in New York, as well, which is relevant to determining the place of performance. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 720 (7th Cir. 2004). Thus, plaintiffs argue that this factor heavily favors application of New York law. We disagree on two grounds.

*First*, we are not persuaded that the performance required of Alitalia was to take place exclusively, or even primarily, in New York. To the contrary, the record is replete with evidence that Alitalia's decisions in connection with plaintiffs were made in both Italy and New York; indeed, the Sales Agreement itself could not be finalized until it was sent to Italy for approval, even though it had been signed and initialed by Alitalia representatives in New York and Chicago. As a result, we doubt that Alitalia's New York office had sole discretion to decide how to perform the Sales Agreement, or whether to breach it.

*Second*, plaintiffs' focus on the location of Alitalia's performance, without consideration of where plaintiffs were to perform their obligations, takes a crabbed view of the Sales Agreement. By entering into this agreement, plaintiffs became the exclusive distributors for Alitalia's flights between Chicago and both Athens and Thessaloniki, Greece for a five-year term from January 1, 2001 through December 31, 2005, and they received other related benefits. Alitalia extended these considerations

to plaintiffs not as an act of charity, but as part of a commercial agreement in which plaintiffs had a reciprocal obligation: to attempt to sell the seats that Alitalia allocated to plaintiffs. Plaintiffs' performance of that obligation was to occur almost exclusively in Illinois generally and Chicago in particular. Plaintiffs were Illinois corporations without any offices outside of Illinois; the ethnic market to which plaintiffs sought to sell the seats was in Illinois; and the actions that plaintiffs took to maximize the sale of seats (such as, personally delivering tickets to customers and providing them with special assistance at the airport in Chicago) occurred almost entirely in Illinois.

Accordingly, we reject the argument that performance of the Sales Agreement was to occur only in New York. The evidence shows that the Sales Agreement was to be performed both in Illinois and outside of Illinois – both in New York and Italy. Thus, contrary to plaintiffs' argument, the place of performance does not strongly favor – or, favor at all – application of New York law.

### 4. Location of Subject Matter.

The location of the subject matter is significant "[w]hen the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk . . ." Restatement (Second) Conflict of Laws, § 188 cmt. e. In this case, the Sales Agreement did not deal with a "specific physical thing," or protect against a localized risk, and thus we do not ascribe much significance to this Restatement factor.

Plaintiffs nonetheless seek to force the square peg of the Sales Agreement into the round hole of the Restatement's definition of "subject matter," arguing that the subject matter of the contract was in New York because that is where the net fares and block spaces "were created and administered" (Pls.' Reply at 10). Even were we convinced that the Sales Agreement involved the kind of subject matter to which this Restatement factor speaks, we would not find plaintiffs' argument persuasive

41

because, again, it takes a myopic view of the Sales Agreement by focusing only on the Alitalia side. Plaintiffs ignore that the Sales Agreement contemplated that plaintiffs would sell seats in Illinois, to be used on flights that originated in Illinois. To the extent that there was a "subject matter" of the Sales Agreement as that term is used in the Restatement, that subject matter was located in both New York and Illinois.

The subject matter of this contract is neither a specific physical thing, nor does it protect against a localized risk. Therefore, it is relatively insignificant.

### 5. Location of Parties.

Plaintiffs are Illinois corporations, which have their principal places of business in Illinois and which have no offices outside of Illinois. Alitalia is an Italian corporation, which maintains its United States headquarters in New York but also maintains an office in Chicago. Thus, plaintiffs are located solely in Illinois, while Alitalia is located in Illinois and elsewhere. Therefore, this factor strongly favors applying Illinois law rather than New York law.

### 6. Section 6 Considerations.

Finally, in evaluating the foregoing factors, we find particularly significant two of the Section 6 Restatement considerations described in *Curran*: "the relevant policies of the forum, [and] the relevant interests of other jurisdictions with respect to the particular issue." *Curran*, 153 F.3d at 488. Here, the policy of Illinois (the forum state) is to be sparing in awarding pre-judgment interest on judgments for breach of contract when the parties have failed to contract for that remedy. There is no Illinois statute that would extend pre-judgment interest to plaintiffs here, and no other Illinois authority that would provide pre-judgment interest on an unliquidated damages award. Application of Illinois law here would not offend these policies, even though the plaintiffs who would benefit

from an award of pre-judgment interest would be Illinois citizens, since the policies of Illinois are that its citizens are not entitled to pre-judgment interest in cases such as this one.

Plainly, New York law favors awards of pre-judgment interest to prevailing plaintiffs in its courts. Here, however, we do not believe that New York has a strong interest in having its law apply to the detriment of a foreign corporation with its chief United States office located in New York, so that pre-judgment interest can be awarded to Illinois citizens who prevailed in court in Illinois. In these circumstances, the interest of New York in this issue is subordinate to that of Illinois.

## C.

Based on the foregoing analysis, we conclude that Illinois law applies to the question of whether plaintiffs are to receive pre-judgment interest on their damages award. As we explained above, under Illinois law, pre-judgment interest is not available to plaintiffs. Accordingly, we deny plaintiffs' motion for an award of pre-judgment interest.[14]

## V.

We now turn to plaintiffs' request for an award of $39,065.39 in taxable costs. Pursuant to Federal Rule of Civil Procedure 54(d), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Rule 54(d) provides a "strong presumption that the prevailing party will recover costs." *Weeks v. Samsung Heavy Indus. Co., Ltd.,* 126 F.3d 926, 945 (7th Cir. 1997) (citations omitted). In accord with the strong presumption, "the prevailing party is prima facie entitled to costs and it is incumbent on the losing party to overcome the presumption."

---

[14]Plaintiffs nonetheless urge that even under Illinois law, the Court has the equitable authority to award pre-judgment interest because Alitalia engaged in a bad faith breach of contract (Pls.' Mot. at 13 n.3; Pls.' Reply at 7 n.2). Plaintiffs, however, acknowledge that they know of no case law reflecting an exercise of that equitable authority to award pre-judgment interest where the contract damages were not liquidated (Pls.' Mot. at 13 n.3). In this case, to the extent that we have equitable authority to grant pre-judgment interest under Illinois law, we decline to exercise that authority.

*Popeil Bros., Inc. v. Schick Elect., Inc.,* 516 F.2d 772, 775 (7th Cir. 1975) (citations omitted). Generally, only two reasons warrant the denial of costs: (1) misconduct by the prevailing party worthy of penalty, or (2) the losing party's inability to pay. *Weeks,* 126 F.3d at 945. Alitalia does not assert that either circumstance exists as a basis for denying costs. Thus, the Court turns to the question of whether the particular costs that plaintiffs seek are recoverable.

The Court may only award costs that "fall into one of the categories of costs statutorily authorized for reimbursement." *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 427 (7th Cir. 2000). Under 28 U.S.C. § 1920, a federal court may tax as costs: (1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. § 1923; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services under 28 U.S.C. § 1828. The award of costs to a prevailing party depends on whether the expenses were "reasonable in amount and necessity." *McCabe v. City of Chicago,* 593 F. Supp. 665, 669 (N.D. Ill. 1984). The prevailing party has the "burden of demonstrating the amount of its recoverable costs." *Tellular Corp. v. Mentor Graphics Corp.,* 2006 WL 1722375, at *1 (N.D. Ill. June 16, 2006).[15]

---

[15]Plaintiffs suggest that this burden rests not with them, but with Alitalia, citing this Court's decision in *Chemetall Gmbh. v. ZR Energy, Inc.,* No. 99 C 4334, 2001 WL 1104604, at *22 (N.D. Ill. Sept. 18, 2001) (Pls.' Mem. at 1; Pls.' Reply Mem. at 1). Plaintiffs' suggestion is incorrect. While a losing party has the burden of rebutting the "strong presumption" against denial of costs to a prevailing party altogether, if that presumption is not overcome, then the prevailing party must show that the specific costs it seeks are reasonable and necessary. That was the standard we applied in *Chemetall,* and that we apply here as well.

Alitalia objects only to two of the items of costs sought by plaintiffs: $8,000.00 for daily trial transcripts, and $9,560.00 for multi-media equipment used to organize and display exhibits at trial. We address each of those objections below.

## A. Trial Transcripts.

Plaintiffs seek $8,000.00 for costs of trial transcripts. Under Section 1920(2), the costs of transcripts and fees for the court reporter may be awarded if they were "necessarily obtained for use in the case." *Barber v. Ruth*, 7 F.3d 636, 645 (7th Cir. 1993). The transcripts need not be "absolutely indispensable in order to provide the basis of an award of costs." *Id.* The transcripts need only be reasonably necessary to provide a basis for an award of costs. *Id.*

Alitalia objects to an award of costs for trial transcripts on the grounds that the daily transcripts were not reasonably necessary, and that Plaintiffs' invoice was not sufficiently detailed to justify recovery. Alitalia further argues that if trial transcript costs are rewarded, they should be reduced to $5,025.90 to comply with the maximum ordinary transcript rate set by the Judicial Conference.

In determining whether to award costs of daily trial transcripts, courts consider several factors: "(1) the length of the trial and the complexity of the issues, (2) whether a daily transcript was necessary to minimize disagreement over the testimony of witnesses, (3) whether proposed findings of fact were required, (4) whether the case involved expert witnesses whose cross-examination required knowledge of the exact wording of their previous testimony or that of any other witness, (5) the size of the claim, [(6)] and the importance of witness credibility." *Tellular Corp.*, 2006 WL 1722375, at *2 n.1 (citation omitted).

45

Consideration of these factors leads us to conclude that the daily transcripts were not merely a convenience for counsel, but were reasonably necessary. At the outset, we note that Alitalia has made extensive use of the trial transcripts in the briefing on post trial motions. This suggests to the Court that Alitalia's true argument is not that plaintiffs acted extravagantly in obtaining the transcripts, but rather that they did not have a reasonable need to do so on an expensive, daily basis for use at trial. On that score, we agree that this six-day breach of contract trial was not excessively long or complex. That said, the trial did involve nine witnesses who testified in person (as well as nine others whose testimony was presented by deposition). For many of the witnesses who testified in court, English was not their native language. While they all spoke English well, many did so in an accented manner. Obtaining daily transcripts, under these circumstances, was reasonable in order to minimize any disagreement or ambiguity about their testimony. Moreover, the size of the claim (the jury awarded $8.5 million in damages) and the importance of the credibility of the testimony of the key witnesses weigh heavily in favor of the reasonable necessity of the transcripts for trial. Finally, we note that Alitalia also obtained the daily transcripts as they were prepared during the course of trial (*see* Pls.' Reply Mem. Ex. A), and presumably did so because Alitalia's counsel found the transcripts reasonably necessary to its defense of the case. For these reasons, we find that it was reasonably necessary for plaintiffs to obtain daily transcripts during the course of trial.

That leaves the question of the adequacy of plaintiffs' documentation of the amount of cost incurred for those transcripts. In support of that claim, plaintiffs submit a copy of the invoice received from the official court reporter. That invoice reflects a charge of $8,000.00 as a deposit for the transcript cost. Alitalia argues that the omission of the total number of pages and the price charged per page prevents the Court from assessing the reasonableness of the costs. The Court may choose

not to award transcript costs when such documentation is missing. *Shah v. Village of Hoffman Estates*, 2003 WL 21961362, at *2 (N.D. Ill. Aug. 12, 2003). However, we believe that to do so here would unnecessarily exalt form over substance, because both parties agree that the total number of pages is approximately 1,523 pages, and the Judicial Conference's accepted charge for daily transcripts rate is $5.50 per page. *See* United States District Court, Maximum Transcript Rates – All Parties (Per Page). *See* http://www/ilnd.uscourts.gov/CLERKS_OFFICE/CrtReporter/trnscrt.htm. That $5.50 rate, rather than the $3.30 rate used by Alitalia in its Objection, is appropriate because we have found that it was reasonably necessary for plaintiffs to obtain daily transcripts. At a rate of $5.50 per page for 1,523 pages, the total transcript cost would be $8,376.50. Since the $8,000.00 sought by plaintiffs is less than that amount, we find it reasonable and will award it. We reject Alitalia's alternative request to reduce the amount awarded for trial transcripts to $5,025.90, since that amount was based on using a per page rate of $3.30 that does not accurately reflect the cost for daily transcripts.

## B. Exemplification Costs.

Plaintiffs seek reimbursement of exemplification costs of $9,560.00 for the rental of multi-media equipment used to organize and display exhibits used during trial. Exemplification fees for multi-media equipment may be awarded "[s]o long as the means of presentation furthers the illustrative purpose of an exhibit," *Cefalu*, 211 F.3d at 428. Once a court decides that an item qualifies as an exemplification cost, the court must determine if the item was "necessarily obtained for use in the case" pursuant to Section 1920(4). Alitalia objects to the exemplification costs on grounds that the equipment was extravagant, and that the equipment was used for exhibits that the jury already had in binders.

47

We do not find Alitalia's objections persuasive. In the final pretrial order, the parties listed (for the most part as joint exhibits) more than 700 documents that they might use at trial. At trial, the parties presented approximately 160 exhibits to the jurors. Plaintiffs' multi-media system allowed them to organize this large number of documents effectively, to (generally) retrieve them quickly, and to display them effectively to the jury. The fact that the jurors also had exhibit books does not render the use of this electronic means of presentation unreasonable or unnecessary. *See Chemetall*, 2001 WL 1104604, at *31 (awarding costs for enlarged exhibits displaying certain contract language contained in exhibits that were in juror binders). The electronic system allowed the lawyers to focus the jurors quickly and effectively on key language in often-lengthy or cumbersome documents. Nor do we believe that (as Alitalia claims) it was extravagant for plaintiffs to use three monitors, which allowed all of the jurors and the Court to better view the documents being displayed.

Plaintiffs no doubt could have selected a less expensive means of displaying documents electronically. However, we find that plaintiffs' system allowed them to organize and present exhibits more effectively than Alitalia, which used a far more simple (and less expensive) technology than plaintiffs selected. Indeed, a measure of the effectiveness of plaintiffs' system is that Alitalia often used it during trial as well to retrieve and display certain exhibits. Given the effectiveness of the system that plaintiffs chose in organizing and displaying large numbers of exhibits and the amount at stake in the case, we find that the costs incurred by plaintiffs for the multi-media system were reasonable and necessary, and we will award them.

48

**C.**

As we stated above, the balance of plaintiffs' bill of costs is unopposed. Accordingly, for the foregoing reasons, we grant plaintiff's bill of costs in its entirety. We award costs of $39,065.39, consisting of $26,340.98 in transcription costs, $12,246.53 in photocopying and exemplification costs, $196.88 in witness fees, $221.00 in docket fees, and $60.00 in fees of the clerk and marshal.

## CONCLUSION

For the reasons set forth above, the Court: (1) denies Alitalia's motion to vacate the judgment as void or, in the alternative, to grant it judgment as a matter of law (doc. # 171); (2) denies Alitalia's motion for judgment as a matter of law on damages for lost sales of airline tickets or, in the alternative, for a new trial on that claim (doc. # 168); (3) denies Alitalia's motion to alter judgment with respect to the damages award for lost land tour package sales and its alternative motion for a new trial, but grants Alitalia's alternative motion for a remittitur on that claim (doc. # 165); (4) denies plaintiffs' motion to amend or correct the judgment to include pre-judgment interest, but grants the motion for an award of post-judgment interest (doc. # 160); and (5) grants plaintiffs' motion for costs in the amount of $39,065.39 (doc. # 163).

By March 16, 2007, Olympia Express shall file a pleading in which it states whether it accepts the remittitur of the $3 million award for lost land tour sales to $1 million, which (if accepted) will result in the Court amending the judgment to reduce the overall award from $8.5 million to $6.5 million. If the remittitur is rejected, the Court will conduct a new trial limited to the issue of damages

for lost land tour package sales. The matter is set for a status conference on March 22, 2007 at 9:00 a.m.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: February 27, 2007